[Cite as *In re D.R.*, 2018-Ohio-522.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re D.R., B.R., W.R.

Court of Appeals Nos. L-17-1240

Trial Court No. JC 15248892

**DECISION AND JUDGMENT**

Decided: February 9, 2018

* * * * *

Adam H. Houser, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Appellant, N.R. ("mother"), appeals the September 22, 2017 judgment of the Lucas County Court of Common Pleas, Juvenile Division, that terminated her parental rights and granted permanent custody of her children, D.R., B.R., and W.R. ("the children"), to appellee, Lucas County Children Services ("LCCS"). The trial court also terminated the parental rights of the children's father, Da.R. ("father"), who is not a party to this appeal. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} On July 6, 2015, LCCS received a referral from Mercy St. Vincent Medical Center about W.R., the youngest child, who tested positive for cocaine and opiates at birth. LCCS held a family case conference on July 9, 2015, at which the parents agreed to a safety plan that included protective daycare for the children while father worked and required an approved adult to check on the children daily. However, the person the parents suggested for providing oversight did not sign the safety plan or appear at court, so the plan was not implemented.

{¶ 3} On July 10, 2015, LCCS filed a complaint in dependency, neglect, and abuse regarding all three children and a motion for protective supervision. At a July 13, 2015 hearing, the magistrate, on the advice of the guardian ad litem ("GAL") appointed for the children, awarded LCCS temporary custody of the children, rather than the protective supervision LCCS requested, and the children were placed into foster care. The magistrate noted that LLCS made reasonable efforts to prevent the children's removal from the home, but the emergency nature of the situation prevented LCCS from providing services to the family before removing the children.

{¶ 4} LCCS developed a case plan for the family with the goal of reunification. The case plan required both parents to undergo substance abuse and mental health assessments and follow any recommendations resulting from the assessments. The parents were given supervised visitation with the children. The case plan also required counseling for D.R. and B.R. and a Help Me Grow evaluation for W.R.

2.

**{¶ 5}** On August 12, 2015, mother and father consented to a finding of abuse for W.R. and a finding of dependency for D.R. and B.R. The magistrate confirmed the findings and awarded temporary custody of the children to LCCS. In her decision, the magistrate said that LCCS had made and continued to make reasonable efforts to return the children to the home by recommending dual diagnosis assessments for both parents. The trial court adopted the magistrate's decision on September 3, 2015.

**{¶ 6}** The trial court held a review hearing on January 7, 2016. Neither parent appeared at the hearing. The magistrate found that mother visited the children regularly and engaged in treatment, but relapsed on December 9, 2015. She also found that father's whereabouts were unknown. The magistrate confirmed that LCCS was making reasonable efforts to reunify the family by providing supportive services. The trial court adopted the magistrate's findings on February 9, 2016.

**{¶ 7}** On June 15, 2016, LCCS filed a motion to change placement of the children and return legal custody of them to mother. Following a hearing on July 7, 2016, the magistrate granted mother legal custody and gave LCCS protective supervision of the children. The magistrate found that mother had successfully completed all case plan services. The trial court adopted the magistrate's decision on July 14, 2016, and the children were returned to mother's custody.

**{¶ 8}** On August 22, 2016, LCCS filed a motion to terminate protective custody. Before the court could hold a hearing on the motion, however, LCCS filed a motion to change disposition and request for emergency hearing. The September 9, 2016 motion

3.

sought temporary custody of the children. In the motion, LCCS said that mother had successfully completed intensive outpatient drug treatment, aftercare, and mental health treatment and was receiving methadone treatment. Despite mother's apparent treatment success, LCCS filed the motion because it received a referral from Mercy St. Vincent Medical Center on September 7, 2016, for a baby mother delivered who tested positive for cocaine and methadone at birth. Mother also tested positive for cocaine at the time of the birth. After it received the referral, LCCS learned that mother had tested positive for alcohol on August 13, 2016, and positive for cocaine on August 19, 2016. Mother admitted to the caseworker that she had used cocaine and had been missing appointments to get her methadone. She also admitted that she lost her job in early August 2016 for reasons unrelated to her drug use. Mother arranged for the private adoption of the new baby, so the baby was not further involved in LCCS's case plan for the family. LCCS also said that father was currently residing in a men's shelter in Michigan. At a hearing held on September 9, 2016, the magistrate awarded LCCS interim temporary custody of the children.

{¶ 9} The court held a dispositional hearing on the motion to change disposition on November 30, 2016. Neither mother nor father appeared for the hearing. The magistrate granted temporary custody to LCCS. The magistrate also found that LCCS continued to make reasonable efforts to reunify the family, but that the parents were not receiving services because they were not in contact with the agency. The trial court adopted the magistrate's decision on January 3, 2017.

4.

**{¶ 10}** On September 27, 2016, LCCS filed a motion seeking mother's voluntary placement in the Lucas County family drug court based on mother's representation that she wanted to enter the program. The court granted the motion on October 21, 2016. Mother was ordered to appear at the drug court on October 31, 2016, but she failed to do so. Although mother participated in two later-scheduled drug court dates, after that she stopped attending. She was unsuccessfully terminated from the program on April 13, 2017.

**{¶ 11}** On April 24, 2017, LCCS filed a motion for permanent custody of the children. LCCS alleged that the children could not or should not be placed with either parent in a reasonable amount of time, the children had been in LCCS's custody for more than 12 of the prior 22 months, and permanent custody was in the children's best interest. As to mother, LCCS stated that she was awarded legal custody of the children on July 7, 2016, after completing intensive outpatient drug treatment, aftercare, and mental health treatment, receiving methadone treatment, obtaining a job, and obtaining independent housing. Unfortunately, she relapsed shortly thereafter.

**{¶ 12}** The motion detailed mother's drug use and unsuccessful drug treatment beginning in August 2016. Mother relapsed on cocaine in August 2016 and admitted to her caseworker that she had been using heroin. Mother reported that she detoxed twice between August 2016 and early December 2016. Mother went to a treatment program on December 23, 2016, but left in January 2017. On February 17, 2017, mother tested positive for alcohol and fentanyl. During the week of March 20, 2017, mother missed

5.

three appointments with her caseworker and failed to provide urine for two drug screens. Following this period of drug use, mother was not engaged in case plan services.

{¶ 13} LCCS also alleged that it could not find relatives willing to care for the children and that its request for a home study for the children's maternal grandmother who lives in Michigan was denied. The motion said that the children were doing well in their foster homes; the foster parents were willing to adopt the children and ensure that the children continued to have contact.

{¶ 14} The trial court held the permanent custody trial on August 21, 2017. Mother failed to appear for the trial. Her appointed counsel requested permission to withdraw from the case because he had not had any contact with mother for approximately ten months. The trial court found that mother's actions waived her right to counsel and granted counsel's request to withdraw.

{¶ 15} LCCS first presented the testimony of Anthony Cardenas, the family's caseworker. Cardenas testified that the children initially came to LCCS's attention in July 2015 because of the parents' substance abuse. LCCS created a case plan for the family that included substance abuse treatment for both parents. He testified that mother did well in treatment and that the agency was looking to return the children to her until she had a relapse with cocaine in December 2015. Following the relapse, mother engaged in treatment with another provider and successfully completed the program, leading LCCS to return legal custody of the children to her in July 2016.

{¶ 16} Cardenas testified that mother and the children were brought to LCCS's attention again in September 2016 when mother gave birth to another child who tested

6.

positive for drugs at birth. Mother admitted to using heroin and cocaine at that time. LCCS sought a shelter care hearing as a result, and the trial court returned the children to the temporary custody of LCCS. LCCS revised mother's case plan to require her to reenter substance abuse treatment. Cardenas said that he worked to have mother accepted into the Lucas County family drug court, but she did not participate in the program. After mother stopped attending drug court, Cardenas said that she went to Arrowhead to go through detox in December 2016. Mother then went to the SOAR program in late December 2016. The program was supposed to last a year, but mother left in January 2017.

{¶ 17} In January 2017, mother next went to Zepf Recovery House with father. They stayed for approximately three weeks. After mother and father left Zepf Recovery House, they went to Family House together. Cardenas said that they told him that "their plan was just to basically stay sober on their own and get jobs and find housing." Both parents told Cardenas that they were not using drugs, so Cardenas requested drug screens. Both parents tested positive: mother for alcohol and fentanyl and father for marijuana and fentanyl. After leaving Family House in late April or early May 2017, mother went to Team Challenge, another year-long treatment program. She stayed for approximately three weeks.

{¶ 18} Cardenas also testified that he had lost contact with the parents. He last met with them on April 4, 2017. He said that they agreed to awarding permanent custody to LCCS. Mother called the agency in June 2017, but Cardenas had not had any contact with her since.

7.

{¶ 19} Under the case plan, mother was given supervised visitation with the children. Cardenas said that mother last visited them before she left for Team Challenge in late April 2017.

{¶ 20} At the time of the hearing, the children were in two foster homes. The two older children were in the same home and the youngest child was in a home with the baby born in September 2016. The foster parents are related and allowed the children to have daily interaction with each other. Cardenas reported that the children were doing well in their placements. The two older children were receiving counseling services. The youngest child, despite testing positive for cocaine at birth, did not have any health or developmental problems. Cardenas also said that mother has a fifth, older child who she voluntarily placed in the custody of the maternal grandmother. Although the sibling and grandmother live in Michigan, the children were in contact with their sibling while they were in foster care. He affirmed that the foster parents wanted to adopt the children.

{¶ 21} Cardenas believed that mother had struggled with drug addiction for four or five years. He testified that granting permanent custody to LCCS was in the children's best interest because LCCS's "multiple efforts" to reunify the children with the parents had failed and the children deserved permanency.

{¶ 22} LCCS also called Judith Orphey, the children's attorney and GAL, to testify. She recommended that LCCS be awarded permanent custody of the children and that they be placed for adoption. She said that permanent custody was in the children's best interest because LCCS could not proceed with adoption planning—which would give the children a legally-secure placement—until it had permanent custody of the

8.

children. According to the GAL, the children were doing well in their foster homes and needed to have stability in their lives. While W.R. was too young to express his wishes, the two older children both expressed a desire to stay in their current placements. The boys were settled in the foster homes, liked their families, had friends there, and wanted to stay there.

{¶ 23} The GAL also testified that mother visited the children only sporadically after her youngest child was born in September 2016 and that the children had not seen mother since April 2017.

{¶ 24} Following the GAL's testimony, the state rested. After a brief recess, the trial court found by clear and convincing evidence that the children should not and could not be returned to the parents, despite reasonable efforts by LCCS to prevent the children's removal from the parents, and that granting permanent custody to LCCS was in the children's best interest.

{¶ 25} In its September 22, 2017 judgment entry, the trial court terminated mother's and father's parental rights and awarded permanent custody of the children to LCCS for adoptive placement and planning. In doing so, the court found by clear and convincing evidence that the children could not or should not be placed with either parent within a reasonable time and that awarding permanent custody to LCCS was in the children's best interest. In determining that the children could not and should not be placed with the parents, the court made findings pursuant to R.C. 2151.414 (E)(1), (2), (4), and (16).

9.

{¶ 26} As to (E)(1), the court found that that mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. Mother did not successfully complete substance abuse treatment, did not participate in drug court when it was offered, and did not maintain her sobriety for an extended period of time. The court also found that LCCS made reasonable efforts to prevent the removal of the children from their home by providing substance abuse and mental health treatment, supervising visitation, requesting an interstate home study of maternal grandmother's home, and providing case management services.

{¶ 27} As to (E)(2), the court found that mother's chemical dependency issues are so severe that she is unable to provide an adequate permanent home for the children within one year of the hearing. Mother's substance abuse began four to five years earlier, she continued to relapse despite receiving substance abuse treatment from many providers, and she refused to participate in drug court.

{¶ 28} As to (E)(4), the court found that mother demonstrated a lack of commitment to the children by failing to regularly visit or communicate with the children when able to do so. Beginning in September 2016, mother did not consistently visit the children and last saw them in late April 2017.

{¶ 29} The trial court's reliance on (E)(16) related only to father. The court found that he had been incarcerated and engaged in criminal activity during the pendency of the case.

10.

**{¶ 30}** Regarding the best interest of the children, the court determined under R.C. 2151.414(D)(1)(a), (b), (d), and (e) that it was in the best interest of the children to award permanent custody to LCCS. Specifically, the court found that (1) the children's needs were being met in their foster homes; (2) awarding LCCS permanent custody would provide the children with a safe, stable, and permanent environment and a legally-secure placement; (3) the two older children were old enough to express their wishes and wanted to remain where they were; and (4) the GAL recommended an award of permanent custody as being in the best interest of the children.

**{¶ 31}** Mother's appointed counsel filed a request to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). In support of his request, counsel states that, after reviewing the record of proceedings in the trial court, he was unable to find any appealable issues. Counsel asserted that after thoroughly reviewing the transcript of proceedings from the trial court as well as the applicable case law, no meritorious assignments of error could be presented. Counsel did, however, submit three potential assignments of error:

> (1) Whether it was in the best interest of the children to award [p]ermanent custody to LCCS pursuant to ORC 2151.414 and ORC 2151.413.

> (2) [W]hether LCCS made reasonable efforts to prevent the need for removal of the children, and the continued need for removal from the child's [sic] home, that despite LCCS reasonable efforts the need for

11.

removal was not rectified and that the children cannot be returned to appellant within a reasonable time[.]

(3) Did LCCS exercised [sic] reasonable efforts to finalize a permancey [sic] plan for the children.

{¶ 32} The procedure to be followed by appointed counsel who desires to withdraw for want of a meritorious, appealable issue is set forth in *Anders*. In *Anders*, the Supreme Court of the United States found that if counsel, after a conscientious examination of the case, determines it to be wholly frivolous, he should so advise the court and request permission to withdraw. *Anders* at 744. This request must be accompanied by a brief identifying anything in the record that could arguably support the appeal. *Id.* In addition, counsel must furnish the client with a copy of the brief, request to withdraw, and allow the client sufficient time to raise any matters she chooses. *Id.* Once these requirements have been satisfied, the appellate court must conduct a full examination of the proceedings held below to decide if the appeal is indeed frivolous. *Id.* If the appellate court determines that the appeal is frivolous, it may grant counsel's request to withdraw and dismiss the appeal without violating constitutional requirements, or it may proceed to a decision on the merits if required by state law. *Id.* The procedures in *Anders* apply to appeals involving the termination of parental rights. *In re B.H.*, 6th Dist. Lucas No. L-15-1166, 2015-Ohio-5495, ¶ 5.

{¶ 33} Here, mother's counsel fulfilled the requirements set forth in *Anders*. Mother did not file a pro se brief or otherwise respond to counsel's request to withdraw.

12.

We shall proceed with an examination of the potential assignments of error set forth by mother's counsel as well as the entire record below to determine if this appeal lacks merit and is, therefore, wholly frivolous.

## II. Law and Analysis

{¶ 34} In his potential assignments of error, counsel suggests that the trial court erred in determining that granting permanent custody to LCCS was in the children's best interest and in finding that LCCS made reasonable efforts to reunify the family. We address each issue in turn.

## A. Law of Permanent Custody

{¶ 35} Revised Code 2151.414 provides the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists. Subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children

13.

services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 36} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43. If the court finds that at least one factor in R.C. 5151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 37} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of

14.

a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" (Internal citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

**B.  Awarding Permanent Custody to LCCS
was in the Children's Best Interest**

{¶ 38} In the first potential assignment of error, counsel contends that awarding permanent custody to LCCS was not in the children's best interest.  We disagree.

{¶ 39} In making a best-interest determination, R.C. 2151.414(D)(1) requires the court to consider all relevant factors, including:

(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)  The custodial history of the child * * *;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

15.

{¶ 40} After hearing the evidence, the trial court concluded under R.C. 2151.414(D)(1)(a), (b), (d), and (e) that awarding permanent custody to LCCS is in the children's best interest. Based on the testimony and evidence, the court determined that all three children are doing well in foster care, are developmentally on target, and are thriving. The caseworker testified that both sets of foster parents are willing to adopt the children and that the foster parents' familial relationship will allow the children to stay in contact. D.R. and B.R. are placed in a foster home together and will be adopted together. Likewise, W.R. is placed in a foster home with his biological sibling (the child born in September 2016) and will be adopted with his sibling. The court also noted the GAL's testimony that the two older children want to remain with their foster family.

{¶ 41} The court acknowledged that the children need and deserve permanency. The court found that the children's need for a legally-secure placement could only be achieved by an award of permanent custody to LCCS because there are no suitable relatives with whom to place the children and the foster families cannot proceed with adoption unless LCCS receives permanent custody. The trial court also recognized that the GAL thought an award of permanent custody to LCCS was in the children's best interest.

{¶ 42} After an independent review of the record, we find that there was competent, credible evidence presented to support all of the trial court's findings about the best interest of the children. Therefore, we find that mother's first potential assignment of error is not well-taken.

16.

## C. LCCS Made Reasonable Efforts

{¶ 43} Counsel's second and third potential assignments of error both relate to the trial court's determination that LCCS made reasonable efforts to the prevent the removal of the children from the home, prevent the continued removal of the children from the home, and finalize a permanency plan for the children. Because the potential assignments of error are related, we consider them together.

{¶ 44} Here, the trial court found that R.C. 2151.414(B)(1)(a) applies, so it examined the R.C. 2151.414(E) factors. "[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38. In this case the court found that R.C. 2151.414(E)(1), (2), and (4) were all applicable to mother:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to

17.

the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *.

{¶ 45} Generally speaking, under R.C. 2151.419(A)(1), the agency must have made reasonable efforts to reunify the family prior to the termination of parental rights. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 21. "By its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33 or 2151.353"—pertaining to adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children *Id.* at ¶ 41; *In re A.A.*, 6th Dist. Lucas No. L-17-1162, 2017-Ohio-8705, ¶ 35. It does not apply to hearings on a motion for permanent custody filed pursuant to R.C. 2151.413. *C.F.* at ¶ 43. Where, however, "the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the 'reasonable case

18.

planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time." *Id.* at ¶ 42.

{¶ 46} The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard in R.C. 2151.414(E)(1). *In re A.B.*, 6th Dist. Lucas Nos. L-12-1069 and L-12-1081, 2012-Ohio-4632, ¶ 25. "A 'reasonable effort' is an 'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *Id.*, quoting *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist.1992).

{¶ 47} The family's case plan required mother to obtain mental health and substance abuse assessments and follow any recommendations resulting from the assessments. Mother initially complied with the case plan and obtained the necessary assessments and treatment. In fact, mother did so well with her case plan requirements that LCCS returned the children to her in July 2016. Unfortunately, after her relapse in August 2016, mother was not able to successfully engage in drug treatment, despite LCCS providing her with treatment options. For example, the family's caseworker testified that he was able to get mother into the Lucas County family drug court after her relapse, but she did not participate and was unsuccessfully terminated from the program.

{¶ 48} Prior to removing the children from the home, LCCS attempted to prevent their removal by implementing a safety plan, but the person the parents chose to oversee the plan did not sign the plan or come to court. Additionally, in the amended case plan

19.

that LCCS filed after removing the children from the home the second time, LCCS stated that there were no services that it could provide to keep the children in the home because mother needed inpatient drug treatment.

{¶ 49} As to LCCS's reasonable efforts in finalizing a permanency plan for the children, the caseworker testified that the foster parents expressed their willingness to adopt the children before LCCS filed its motion for permanent custody. LCCS was unable to finalize the adoption plan until the parents' parental rights were terminated, however. We also note that the record contains a case plan filed after LCCS received permanent custody of the children saying that the children are being placed for adoption and that the foster parents are interested in adopting them.

{¶ 50} After an independent review of the record, we find that there was competent, credible evidence presented to support the trial court's finding that LCCS made reasonable efforts with mother and the family to prevent the removal of the children, to return the children, and to finalize a permanency plan for the children. Accordingly, mother's second and third potential assignments of error are not well-taken.

### III. Conclusion

{¶ 51} This court has thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Appointed counsel's potential assignments of error are without merit.

20.

{¶ 52} Upon our own independent review of the record, we find no grounds for a meritorious appeal. Accordingly, this appeal is found to be without merit and is wholly frivolous. Counsel's motion to withdraw is found well-taken and is hereby granted.

{¶ 53} The September 22, 2017 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal are assessed to mother pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE
Thomas J. Osowik, J.

_____
JUDGE
Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE